**SUMMONS - CIVIL**
(Except Family Actions)
JD-CV-1 Rev. 1-2000
C.G.S. § 51-346, 51-347, 51-349, 51-350, 52-45a,
52-48, 52-259, P.B. Secs 3-1 thru 3-21, 8-1

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
www.jud.state.ct.us

"X" ONE OF THE FOLLOWING:
Amount, legal interest or property in demand, exclusive of interest and costs is:
☐ less than $2,500
☐ $2,500 through $14,999.99
☒ $15,000 or more
("X" if applicable)
☐ Claiming other relief in addition to or in lieu of money or damages.

**INSTRUCTIONS**
1. Type or print legibly: sign original summons and conform all copies of the summons.
2. Prepare or photocopy conformed summons for each defendant.
3. Attach the original summons to the original complaint, and attach a copy of the summons to each copy of the complaint. Also, if there are more than 2 plaintiffs or 4 defendants prepare form JD-CV-2 and attach it to the original and all copies of the complaint.
4. After service has been made by a proper officer, file original papers and officer's return with the clerk of court.
5. The party recognized to pay costs must appear personally before the authority taking the recognizance.
6. Do not use this form for actions in which an attachment, garnishment or replevy is being sought. See Practice Book Section 8-1 for other exceptions.

TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.

RETURN DATE (Mo., day, yr.) (Must be a Tuesday) **12/19/06**

| | | | | | |
|---|---|---|---|---|---|
| ☒ JUDICIAL DISTRICT ☐ HOUSING SESSION | G.A. NO. | AT (Town in which writ is returnable) (C.G.S. 51-346, 51-349) **Hartford** | | CASE TYPE (See JD-CV-1c) Major **C** Minor **90** | |

ADDRESS OF COURT CLERK WHERE WRIT AND OTHER PAPERS SHALL BE FILED (No., street, town and zip code) (C.G.S. 51-346, 51-350)
**95 Washington Street, Hartford, CT 06106**
TELEPHONE NO. (w/area code) **860-548-2700**

| PARTIES | NAME AND ADDRESS OF EACH PARTY (No., street, town and zip code) | NOTE: Individuals' Names: Last, First, Middle Initial ☐ Form JD-CV-2 attached | PTY NO. |
|---|---|---|---|
| FIRST NAMED PLAINTIFF | WILLIAMS, HERBERTIA - 4450 Rivanna Lane #3730, Fairfax, VA 22030 | | 01 |
| Additional Plaintiff | | | 02 |
| FIRST NAMED DEFENDANT | BOARD OF TRUSTEES FOR THE UNIVERSITY OF CONNECTICUT - c/o Richard Blumenthal, Attorney General, State of Connecticut, 55 Elm Street, Hartford, CT 06141 | | 50 |
| Additional Defendant | BRAVO-URETA, BORIS - 52 Fieldstone Drive, Mansfield, CT 06268 | | 51 |
| Additional Defendant | WENTZEL, MARK - 9 Daleville Road, Storrs, CT 06268 | | 52 |
| Additional Defendant | | | 53 |

**NOTICE TO EACH DEFENDANT**

1. **YOU ARE BEING SUED.**
2. This paper is a Summons in a lawsuit.
3. The Complaint attached to these papers states the claims that each Plaintiff is making against you in this lawsuit.
4. To respond to this Summons, or to be informed of further proceedings, you or your attorney must file a form called an "Appearance" with the Clerk of the above-named Court at the above Court address on or before the second day after the above Return Date.
5. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default.
6. The "Appearance" form may be obtained at the above Court address.
7. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately take the Summons and Complaint to your insurance representative.
8. If you have questions about the Summons and Complaint, you should consult an attorney promptly. **The Clerk of Court is not permitted to give advice on legal questions.**

| DATE 11/14/06 | SIGNED (Sign and "X" proper box) | ☒ Comm. of Superior Court ☐ Assistant Clerk | TYPE IN NAME OF PERSON SIGNING AT LEFT Jacques J. Parenteau |
|---|---|---|---|

FOR THE PLAINTIFF(S) PLEASE ENTER THE APPEARANCE OF:

| NAME AND ADDRESS OF ATTORNEY, LAW FIRM OR PLAINTIFF IF PRO SE (No., street, town and zip code) Madsen, Prestley & Parenteau, P.O. Box 1631, New London, CT | TELEPHONE NUMBER 860-442-2466 | JURIS NO. (If atty. or law firm) 418345 |
|---|---|---|

NAME AND ADDRESS OF PERSON RECOGNIZED TO PROSECUTE IN THE AMOUNT OF $250 (No., street, town and zip code)
Kate Demitrus, 44 Capitol Avenue, Hartford, CT 06103
SIGNATURE OF PLAINTIFF IF PRO SE

| # PLFS. 1 | # DEFS. 3 | # CNTS. 6 | SIGNED (Official taking recognizance; "X" proper box) | ☒ Comm. of Superior Court ☐ Assistant Clerk | For Court Use Only FILE DATE |
|---|---|---|---|---|---|

IF THIS SUMMONS IS SIGNED BY A CLERK:
a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts.
b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law.
c. The Clerk is not permitted to give any legal advice in connection with any lawsuit.
d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service thereof.

ATTEST: A TRUE COPY
BRIAN FRANCIS ZITO
CONNECTICUT
STATE MARSHAL

| I hereby certify I have read and understand the above: | SIGNED (Pro Se Plaintiff) | DATE SIGNED | DOCKET NO. |
|---|---|---|---|

RETURN DATE: DECEMBER 19, 2006

| | |
|---|---|
| HERBERTIA WILLIAMS, : <br> PLAINTIFF : | SUPERIOR COURT |
| VS. : | JUDICIAL DISTRICT <br> OF HARTFORD |
| BOARD OF TRUSTEES FOR THE : <br> UNIVERSITY OF CONNECTICUT, : <br> BORIS BRAVO-URETA, <br> MARK WENTZEL <br> DEFENDANTS : | NOVEMBER 14, 2006 |

## COMPLAINT

COUNT ONE:

1. Plaintiff Herbertia Williams is an individual who currently resides in the state of Virginia and her mailing address is 4450 Rivanna Lane #3730, Fairfax, VA 22030. At all relevant time mentioned in this complaint, plaintiff was employed by the University of Connecticut at its main campus in Storrs, Connecticut. Plaintiff is an African-American female and has a diagnosed learning disability.

2. Defendant Board of Trustees for the University of Connecticut is authorized by state statute to operate and oversee the University of Connecticut ("UCONN"). At all relevant times mentioned in this complaint UCONN was plaintiff's employer.

3. Defendant Boris E. Bravo-Ureta is an individual who upon information and belief resides at 52 Fieldstone, Mansfield, CT 06268-2572. At all time relevant to this complaint, defendant Bravo-Ureta was acting under the color of state law as the Executive Director of the Office of International Affairs at UCONN and plaintiff's supervisor.

4.   Defendant Mark Wentzel is an individual who upon information and belief resides at 9 Daleville Road, Mansfield, CT 06268. At all time relevant to this complaint, defendant Wentzel was acting under the color of state law as the Director of the Department of International Services and Programs and plaintiff's immediate supervisor.

5.   Plaintiff was first employed by the University of Connecticut on or about July 1, 2000, when she was hired to be the Associate Dean of Students and relocated from northern Virginia to accept this position.

6.   On March 29, 2002, plaintiff complained that the Dean of Students, John Saddlemire, created a hostile work environment on the basis of plaintiff's gender and race in connection with letters he had written relating to plaintiff's "attention to detail" in the performance of her job. Many of the accusations were unfounded and reflected an unwillingness to interact with plaintiff on a personal basis.

7.   Plaintiff complained that Dean Saddlemire's unwillingness and inability to relate concerns on a timely basis was likely tied to Dean Saddlemire's expressed view toward African-American females, because "all black women look alike," referring to a comment he made at a Dean of Students staff meeting in response to notice that voicemail messages were mistakenly forwarded to another co-worker who is also an African American female when they were intended for the plaintiff.

8.   Subsequent to plaintiff's complaint against Dean Saddlemire, which was filed with the defendant's Office of Diversity and Equity ("ODE"). Dr. Vicky Triponey, Vice Chancellor for Student Affairs, met with plaintiff, apologized for Dean Saddlemire's behavior and arranged for plaintiff to interview for a vacant position of lesser rank in the Department of International Service and Programs ("DISP").

2

9.  After plaintiff interviewed with the DISP Director Mark Wentzel and accepted the position of Immigration Employment Advisor commencing on June 1, 2002, Vice Chancellor Triponey orally requested that plaintiff withdraw her complaint from the ODE so the ODE would not be required to investigate the allegations against Dean Saddlemire. Plaintiff felt obligated to do so.

10. Plaintiff began working in the DISP on June 3, 2002. Shortly thereafter, Director Wentzel informed plaintiff that one of her new co-workers, Susanne Atrens, a Caucasian woman, wrote an email to William "Bill" Warner, an employee in the Human Resources Department, stating that there was now "too much color" in the DISP office. Plaintiff informed Director Wentzel that Susanne Atrens' statement was inappropriate and offensive. To plaintiff's knowledge, Director Wentzel took no corrective action with regard to Susanne Atrens.

11. On June 24, 2002 the DISP conducted a retreat. The report of the facilitator documented dysfunctional office communications in the DISP and "a clear tendency by members of the staff to personalize professional disagreements, rely on wrongful or obsolete perceptions of what should or could be, and overall misconceptions of their privileges and/or responsibilities."

12. During June and July 2002, plaintiff chaired a search committee at Director Wentzel's request to hire a Program Aide. During the search, Nick Omari, a Program Aide supporting Director Wentzel, informed plaintiff that he and Director Wentzel wanted plaintiff to hire Tanya Cleveland-Wiggans, an African American woman who worked in the office on an interim basis and was Director Wentzel's former tenant.

Plaintiff told Nick Omari that she, with agreement from the search committee members, would recommend the most qualified person from the pool.

13. When plaintiff approached Director Wentzel for clarification based on Nick Omari's remark, Director Wentzel told her that she should "attempt to hire one of her own," referring to plaintiff's gender and race. After the search committee submitted assessments to Director Wentzel, he offered the job to Tanya Cleveland-Wiggans, who then reported to plaintiff. The search committee's evaluation demonstrated that another candidate would have been more qualified for the position.

14. Director Wentzel rated plaintiff's performance with an "Overall Rating" of "Outstanding" at the end of the 2002-2003 academic year.

15. On or about April 21, 2003, Director Wentzel mentioned that Susanne Atrens told him that she believed Tanya Cleveland-Wiggans and plaintiff were "bullies" and that she was frightened because they were black females. Director Wentzel then informed plaintiff that he counseled Susanne Atrens. He also informed plaintiff that Susanne's communication style was "linear and rigid" based on her Germanic ancestry and that plaintiff was "more emotional and passionate" because she was an African American female raised by a single parent. The following week plaintiff told both Susanne Atrens and Director Wentzel that she found both their comments to be offensive and discriminatory.

16. Plaintiff was initially diagnosed with a learning disability in December 1988 at the University of Virginia. This diagnosis was reiterated in an assessment in June 2003. Plaintiff disclosed this information in confidence to Director Wentzel at the start of

her employment at the DISP when requesting an accommodation to work flexible hours during peak periods of activity in the DISP.

17. On or about April 29, 2004, plaintiff left work at 3:00 rather than 4:30, in accordance with her flexible schedule agreement. The following work day, when plaintiff informed Director Wentzel of her early departure, he informed her he knew because Susanne Atrens had emailed this information to him.

18. On April 30, 2004, plaintiff contacted the ODE and made a formal request for two accommodations, (1) flexible work schedule and (2) voice activated word processing software. Plaintiff provided medical documentation from Marcie Gueret Swift, a Nationally Certified School Psychologist, which supported plaintiff's requests because she has a "moderate to severe learning disability specific to written language and language processing." Plaintiff advised the ODE that her request was intended to formalize the accommodation in order to minimize "office chatter" and the false assumption on the part of co-workers that the informal arrangement plaintiff had reached with Director Wentzel constituted preferential treatment.

19. On May 4, 2004, plaintiff met with Director Wentzel to discuss the accommodations she requested. In a follow up email communication, plaintiff pointed out to Director Wentzel that one of the features of the voice activated word processing software was the ability to play back what was recorded. Director Wentzel agreed to the accommodations plaintiff requested. The software was loaded on her computer and PDA device. Thereafter, plaintiff would occasionally use the PDA to make a record of meetings so that she would be able to process the information at a later time. Plaintiff informed Director Wentzel on more than one occasion that she was acting in

5

accordance with information she had recorded at meetings. Director Wentzel never expressed disapproval of this action.

20. Director Wentzel rated plaintiff's Overall Performance as Outstanding at the end of the 2003-2004 academic year. Under "Areas of Strength," Director Wentzel stated she had "keen communication, mediation and conflict resolution skills" that had a "marked impact on positive team building among her colleagues in the department."

21. On August 13, 2004, at the end of a day spent coordinating the move of the DISP offices to the newly renovated Student Union Building, Susanne Atrens informed plaintiff and other staff members that a co-worker, Sylvia Waller, had left the office early sobbing. When plaintiff asked Atrens if she knew why Waller was upset, she explained she had no idea but further explained that "at her age, she can't handle much change." The following day, plaintiff met with Waller to discuss what happened the day before and provide support as her supervisor. Waller told plaintiff that Atrens' told her to "go sit some where and be patient because other DISP cannot help you find a ruler to measure your desk." Waller explained that the statement and the manner in which it was conveyed hurt and offended her. Plaintiff then disclosed the exchange between her, DISP staff and Atrens after Waller's departure. After meeting with Waller, plaintiff informed Director Wentzel of the incident and requested he take some action regarding this ageist remark. Plaintiff told Director Wentzel that she had witnessed similar conduct that was inappropriate and offensive since her arrival at DISP by staff that went unaddressed by him. To plaintiff's knowledge, Director Wentzel took no corrective action against Susanne Atrens.

22. In August 2004, plaintiff was asked to take the position of Associate Director of the DISP, a new position created in response to increased responsibilities for the DISP and in response to the expected extended absence of Director Wentzel in the upcoming 2004-2005 academic year as he traveled to Dubai in connection with work. Plaintiff was promised an increase in her compensation to go along with the promotion.

23. Plaintiff met with Dr. Boris Bravo-Ureta, Executive Director of the Office of International Affairs, and with Director Wentzel on August 27, 2004, and with them and Dr. Ronald Taylor, Vice Provost for Multicultural and International Affairs/Professor of Sociology, on August 30, 2004 regarding the creation of the Associate Director position.

24. During the process of creating the position, Director Wentzel asked Human Resources to bypass the national search requirements because plaintiff was "an exceptional case."

25. At the end of the meeting on August 30, 2004, plaintiff informed Vice Provost Taylor that she was concerned that her management style would not compliment that of Director Wentzel, as they were extremely different. Plaintiff advised Dr. Taylor that she had witnessed odd and disturbing incidents at the DISP, including, but not limited to, the incidents referred to herein, and expressed concern over how she would fit in as a manager. Dr. Taylor assured plaintiff that the "buck stops with me." Plaintiff accepted the promotion relying upon the assurances of support she received from Dr. Taylor.

26. Although plaintiff assumed the duties of Associate Director immediately, Director Wentzel told her in October 2004 that she should not use the title because Human Resources had not yet approved the position and plaintiff's wage was not

increased as promised. The Associate Director position was not approved consistent with union policies and plaintiff did not receive the promised wage increase in a timely manner despite performing the duties of the position.

27. In October 2004, mismanagement of the DISP associated with Director Wentzel's offer of employment to Vijaya Srikanti came to light and the search for the position Tanya Wiggan-Cleveland vacated had to be cancelled for lack of funding in the budget. Director Wentzel and Executive Director Bravo-Ureta argued and accused each other of mismanagement in plaintiff's presence.

28. In a follow up meeting after Director Wentzel had returned to Dubai for work, Executive Director Bravo-Ureta asked plaintiff if she wanted him to fire Director Wentzel. Plaintiff responded that she was concerned that she would be held accountable for Director Wentzel's mismanagement that led to budget shortfalls, unfunded positions in the face of increasing work load in the DISP and creating and maintaining an unhealthy and unsafe working environment based on Director Wentzel's deficient, and some cases, illegal employment decisions. Plaintiff expressed the desire that Director Wentzel simply perform his duties.

29. After suffering several anxiety attacks based on work-related stress, plaintiff later told Vice Provost Taylor that she was concerned the conflict between Director Wentzel and Executive Director Bravo-Ureta would adversely affect her.

30. On November 15, 2004, Executive Director Bravo-Ureta reassigned individuals to certain significant tasks relating to the Peoplepass Database Implementation Project, contrary to the previous assignments made by Director Wentzel before he left for Dubai. As a result, neither Nick Omari nor Susanne Atrens were given

roles in the project, and another consultant, David Horrigan, was replaced by Megan Brown.

31. Upon his return, Director Wentzel falsely accused plaintiff of making these assignments and used the decision made by Executive Director Bravo-Ureta as the basis for a negative performance evaluation the following May 2005.

32. In December 2004, Executive Director Bravo-Ureta informed plaintiff that Director Wentzel had grossly overestimated the number of international students at UCONN for 2003 and 2004 in federal and state reports. Plaintiff and co-worker, Robert Chudy, were directed Executive Director Bravo-Ureta to provide accurate figures for the current and past academic years. After plaintiff was placed on administrative leave (August 11, 2005) evidence supports that the DISP continued to report incorrect information to the public.

33. In November 2004 plaintiff began to question the job responsibilities of Nick Omari, who appeared to have a special relationship with Director Wentzel, in response to budget concerns. At the same time, defendant's Human Resources Department was conducting an audit of Nick Omari's job classification. When plaintiff asked Executive Director Bravo-Ureta to explain her level of involvement with this job classification, she was directed to "stay out of it." As result of the audit, Nick Omari's wage was reduced when the temporary special increase obtained by Director Wentzel, two years earlier, was taken away and his position was reclassified.

34. After plaintiff informed Nick Omari of the adjustment, he requested plaintiff's assistance in challenging the decision and plaintiff referred him to the union (UCPEA). Later when Nick Omari complained that she did not like him, plaintiff

requested mediation through Human Resources. During the mediation, plaintiff was frightened by Omari's mischaracterization of events and requested that Omari report to another DISP employee while Director Wentzel worked abroad. As a result, Nick Omari was told to report to Robert Chudy and advised that he could not communicate with plaintiff directly, unless there was a third party present. Nick Omari violated the directive regarding direct communication and, to the best of plaintiff's knowledge, no corrective action was taken. When Omari complained to Director Wentzel, plaintiff feared that Director Wentzel would retaliate because Omari and Director Wentzel maintained a special relationship.

35. Director Wentzel returned from Dubai in late March 2005.

36. On or about April 29, 2005, plaintiff met with Director Wentzel to discuss the role of David Horrigan in the implementation of the Peoplepass Program during Director Wentzel's absence. At one point during the meeting, plaintiff advised Director Wentzel that she was recording the meeting to transcribe the conversation into notes using her PDA. In response, Director Wentzel thanked plaintiff for reminding him about her accommodations.

37. Within an hour of the meeting, Director Wentzel handed plaintiff a memo accusing her of illegal and inappropriate conduct.

38. On May 2, 2005, plaintiff replied in writing. Plaintiff pointed out that Director Wentzel was aware of her learning disability and the accommodations previously made, including the well known fact that plaintiff had recorded meetings in the past for this purpose. Plaintiff advised Director Wentzel that she would seek the assistance of the ODE.

39. On May 2, 2005, Director Wentzel and Executive Director Bravo-Ureta conducted plaintiff's annual performance review. Director Wentzel and Executive Director Bravo-Ureta lowered plaintiff's Overall Rating two levels from Outstanding to Good. Unlike her previous annual review, Director Wentzel did not recommend a merit increase. The performance evaluation was highly critical of the reassignment of personnel in the Peoplepass Implementation Project, a decision that had been made by Executive Director Bravo-Ureta. Plaintiff was also falsely accused of understaffing the office during the winter intercession when plaintiff left on a previously authorized vacation and the office load increased because of the tsunami in Indonesia. The performance evaluation also criticized plaintiff's "communication style." None of these concerns had previously been raised with plaintiff during the performance evaluation period.

40. Later that day, following the meeting with Director Wentzel and Executive Director Bravo-Ureta, plaintiff complained to Vice Provost Taylor after seeing him at a University Senate meeting that she was being mistreated and that the review was malicious and in retaliation for her expressions of concern regarding the potential fraud and mismanagement in the DISP. Vice Provost Taylor said he felt sorry for her but could not get involved with her situation. Amidst tears, she asked him if he would provide a reference if plaintiff started a job search. Vice Provost Taylor stated he had no reservations about providing a strong professional reference to potential employers. To plaintiff's knowledge Vice Provost Taylor never took any action on her request to investigate her complaint.

41.     On May 5, 2005, plaintiff met with ODE along with Director Wentzel to discuss her requests for reasonable accommodation with regard to her learning disability.

42.     On May 12, 2005, ODE Assistant Director Eileen Duggan stated that she required additional documentation of plaintiff's medical condition and offered the opinion that tape recording of conversations for assistance in processing information without consent of the other party was not a reasonable accommodation. She also stated that recording a face to face conversation without the consent of the other party "may rise to the level of criminal conduct," without citation to authority. It was plaintiff's understanding that there was nothing "criminal" about what she had done under Connecticut law. ODE Assistant Director Eileen Duggan suggested someone be assigned as a note-taker until further information was received, but never explored the reasonableness of tape recording meetings with the consent of the other co-worker.

43.     On May 23, 2005, plaintiff provided additional medical documentation to ODE Assistant Director Eileen Duggan. The report of Dr. Robert Cerciello, a physician who is Board Certified in Pediatrics and in Neurology, stated that plaintiff was under his care for Attention Deficit Hyperactivity, which he diagnosed on June 11, 2003. One of the recommendations in the report of Marcie Gueret Swift, a Nationally Certified School Psychologist, stated, "Since note-taking may be problematic due to motoric deficits, use of a tape recorder may be considered, when appropriate."

44.     On June 10, 2005, Director Wentzel announced he would be away in Dubai from June 13 until July 10, 2005.

45. During a staff meeting following his announcement that he would be away in Dubai, Director Wentzel stated that plaintiff would not be Acting Director this time and he reassigned her supervisory duties in the office to subordinate co-workers, such as Susanne Atrens and Nick Omari, effectively demoting plaintiff from the position of Associate Director.

46. The reduction in plaintiff's responsibilities is documented in an email to the DISP staff dated June 13, 2005.

47. On June 10, 2005, plaintiff met with ODE to continue the discussion of reasonable accommodations. Plaintiff complained to ODE Assistant Director Eileen Duggan that Director Wentzel had intentionally excluded plaintiff from meetings and changed her job duties as a form of retaliation based on her disability. Plaintiff also informed ODE Assistant Director that Director Wentzel had not provided a note-taker for meeting per her May 12 memorandum. ODE Assistant Director Eileen Duggan said she would investigate this complaint when he returned from Dubai. To plaintiff's knowledge, Ms. Duggan never performed such investigation.

48. On June 23, 2005, Executive Director Bravo-Ureta, informed plaintiff that Susanne Atrens would meet with Human Resources staff, in Director Wentzel's absence, to evaluate and discuss Tacoya Stathum's reclassification. Tacoya Stathum was one of plaintiff's direct reports. Taking away the responsibility to discuss reclassification with Tacoya Stathum was an act of demotion. Later in the day, Karla Desjarden, Human Resources Associate contacted plaintiff and stated that the reclassification meeting with Tacoya Stathum's supervisor would occur with Director Wentzel upon his return to the country. Desjarden informed plaintiff that she would

accept a written statement evaluating Stathum's work performance when plaintiff was her direct supervisor.

49. On July 14, 2005, Director Wentzel informed Tacoya Stathum that she would no longer report to plaintiff. Instead, she would report to Susanne Atrens. This information was never communicated to plaintiff on or after the change was announced to Tacoya Stathum. The removal of Tacoya Stathum as a direct report was an act of demotion.

50. On July 7, 2005, Deborah Rea, a university student who volunteered and interned in the DISP office from 2003 - 2005, wrote a memo to Executive Director Bravo-Ureta "as requested" by Executive Director Bravo-Ureta, to complain about "what has transpired while plaintiff has been part of the International Office from 2003-2005".

51. Executive Director Bravo-Ureta never advised plaintiff of the content of the Deborah Rea complaint nor allowed her to address the allegations at the time, although most of what was contained there had been previously disclosed to Executive Director Bravo-Ureta in November 2004 and he told plaintiff then not to worry about the complaint. Among other false statements, Deborah Rea claimed plaintiff "dismissed" her from interning in the office during the 2005 Spring semester.

52. On July 14, 2005, Executive Director Bravo-Ureta told Deborah Rea, that he made a mistake in hiring plaintiff and that it would be "difficult to get rid of her, given she is a black female who holds tenure ...."

53. Executive Director Bravo-Ureta also told Deborah Rea on July 14, 2005 that plaintiff did not know how to manage people. Plaintiff did not learn of these statements until July 26, 2005.