54. On July 20, 2005, in response to plaintiff's follow up request from their May 2 conversation, Vice Provost Taylor stated he would provide plaintiff with a "strong reference".

55. On July 25, 2005, Director Wentzel met with Sylvia Waller regarding the Labor Certification Application (LCA) compliance audit that had been initiated at plaintiff's request. Office records indicated that the DISP had failed to post LCAs consistently and inform Human Resources or employment bargaining units, when necessary, since 2000 and this was a serious matter that Director Wentzel was aware of since January 2004. Director Wentzel never made posting LCAs or informing Human Resources and bargaining units a priority, despite the fact plaintiff had brought the matter to his attention, nor did he mention this project in plaintiff's 2004 evaluation where he rated plaintiff Outstanding.

56. In the course of asking Sylvia Waller about plaintiff's activities related to the LCA issue later during the week of July 25, 2005, Director Wentzel stated, "Now I've got her." The following day, Waller informed plaintiff of Director Wentzel statements and cautioned plaintiff to be careful.

57. On July 29, 2005, plaintiff spoke to Dana McGee, the Director of the ODE, and informed her that Executive Director Bravo-Ureta and Director Wentzel were setting plaintiff up to terminate her employment. Director McGee told plaintiff she would investigate the situation and get back to her.

58. On July 31, 2005, plaintiff submitted a response to her May 2 performance evaluation to Executive Director Bravo-Ureta, Director Wentzel, Vice Provost Taylor and Aliza Wilder, Director of Human Resources. Plaintiff pointed out that the performance

evaluation was one-sided and biased. Plaintiff specifically stated that the assignments made in the Peoplepass Implementation Project were made by Executive Director Bravo-Ureta and plaintiff was not to blame.

59. On August 5, 2005, ODE Director Dana McGee advised plaintiff that her investigation revealed significant email communications showing "our manager's hands are unclean."

60. Director Dana McGee then proposed a severance agreement could be negotiated that would include outplacement services and confidentiality. Plaintiff agreed to explore this proposal based on what she viewed as her limited options in light of plaintiff's supervisors' expressed desire and explicit behavior to terminate her employment.

61. On August 10, 2005, Director Wentzel came to plaintiff's office and requested that she remove files that plaintiff had been working on to a central location. When plaintiff stated this would cause problems with ongoing work, Director Wentzel insisted that the files be moved immediately on instructions from Executive Director Bravo-Ureta.

62. Plaintiff agreed to do what Director Wentzel demanded and asked him to leave her office while she processed how this would best be accomplished given the work she was performing on the files. Director Wentzel took offense to plaintiff's request and stated more than once that she had no right to be disrespectful. Plaintiff stated that she didn't understand how her request was disrespectful. When plaintiff reiterated her request and he refused to leave, she started crying. Plaintiff told Director Wentzel she would call Campus Security because she was scared of him. Plaintiff

16

attempted to call Campus Security but, given her emotional state, was unable to remember the phone number.

63.     Director Wentzel then walked to plaintiff's office door, opened it, paused and then turned to face plaintiff in her office doorway. In a loud voice, he stated again that the plaintiff had no right to be disrespectful. When the plaintiff realized that Director Wentzel would not leave, she continued to cry and begged Director Wentzel to please leave her office again. After a brief delay, Director Wentzel left plaintiff's office. Director Wentzel's actions were staged and planned to make it seem that plaintiff had acted in an insubordinate manner.

64.     When plaintiff arrived at work on August 11, 2005, Executive Director Bravo-Ureta came to her office and handed plaintiff a letter stating plaintiff was being placed on an administrative leave pending investigation of accusations made against plaintiff by Director Wentzel. Director Wentzel claimed that plaintiff had raised her voice and acted as if she intended to push him out of plaintiff's office the day before. The letter accused plaintiff of insubordination and inappropriate behavior. Plaintiff was banned from the campus and communication with UCONN students, faculty and personnel absent permission from Executive Director Bravo-Ureta.

65.     On September 1, 2005, Executive Director Bravo-Ureta conducted a "fact-finding" interview into the August 10th incident as reported by Director Wentzel.

66.     In conducting the investigation through Executive Director Bravo-Ureta, UCONN failed to appoint an impartial decision-maker.

67.     On October 12, 2005, the University of Connecticut Professional Employees Association ("UCPEA") wrote to UCONN's Labor Relations Specialist to

17

lodge a complaint after being informed that an additional fact-finding had been scheduled to investigate new allegations unrelated to the August 10th incident addressing other performance issues.

68.  The UCPEA stated that Executive Director Bravo-Ureta's intention to address performance issues through a fact-finding interview, usually a procedure reserved for disciplinary matters, violated Article 22 of the collective bargaining agreement.

69.  Despite this protest from the UCPEA, a fact-finding interview proceeded on October 18, 2005. On that date, no finding had been made regarding the initial fact-finding on September 1, 2005. On October 18, 2005, UCONN had interviewed all witnesses to the alleged insubordination and inappropriate behavior, some on more than one occasion.

70.  In connection with the October 18, 2005 interview, plaintiff was presented with eight "complaints," two from co-workers: Susanne Atrens (an undated memo that refers to plaintiff's demotion in June 2005 as a recent event); and Director Wentzel (submitted September 12, 2005 and dealing with LCA posting issue), one from a university student who volunteered and interned at the DISP, Deborah Rea (her memo of July 7, 2005 referred to above); and five from other UCONN employees (four of which were clearly solicited after August 10, 2005 relating to matters that had occurred in the distant past). One of the complaints from a UCONN employee related to an incident that occurred during plaintiff's prior employment period in 2004. None of the complaints had been discussed with plaintiff on or near the time of the alleged incident.

18

71. One of the individuals who had been solicited by Director Wentzel to provide a statement included with the eight complaints was also asked, at the same time the statement was solicited, to apply for plaintiff's position. That individual responded, "How can I apply for a position that is not vacant?"

72. Plaintiff appeared at the interview on October 18, 2005. At the beginning of this interview, as with the September 1, 2005 interview, plaintiff protested Executive Director Bravo-Ureta's role as fact-finder based on his involvement in some of the incidents that he was investigating. During the middle of the interview, plaintiff reiterated her protest when Executive Bravo-Ureta continued posing questions in an accusatory manner and directed the note-taker to document statements plaintiff did not utter.

73. On October 19, 2005, the UCPEA lodged a complaint that plaintiff's personnel file was not being kept as required by Article 19 of the collective bargaining agreement.

74. On October 19, 2005, plaintiff filed a grievance alleging she was subjected to a hostile work environment on an ongoing basis since taking over the position of Associate Director. Plaintiff stated that despite her complaints to Director Wentzel in April 2005 and to Vice Provost Taylor on May 2, 2005, no action had been taken to investigate plaintiff's complaints. According to the collective bargaining agreement, UCONN was required to respond within 14 days of the submission of plaintiff's grievance.

75. On November 11, 2005, plaintiff responded in writing to the allegations raised at the October 18, 2005 fact-finding interview.

19

76. On November 23, 2005, the UCPEA lodged a complaint that the minutes of the fact-finding interview did not reflect plaintiff's protest relating to Executive Director Bravo-Ureta's role as fact-finder. The UCPEA also complained that UCONN had withheld information relevant to plaintiff's defense of the solicited complaints. The UCPEA requested that an independent hearing officer be assigned to hear the grievance.

77. As of December 22, 2005, plaintiff was still placed on administrative leave and UCONN had not rendered findings for the two separate disciplinary interviews, nor had UCONN processed plaintiff's October 19th grievance in a timely manner.

78. Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") in late December of 2005.

79. After plaintiff filed a complaint with the CHRO in December of 2005, plaintiff expected that responsible officials at UCONN would investigate her complaints and take appropriate action to reinstate plaintiff to her position in a timely manner. Instead, UCONN continued to force plaintiff to attend disciplinary and grievance hearings conducted by Dr. Boris Bravo-Ureta, who plaintiff alleged was biased and who had engaged in discriminatory acts.

80. UCONN delayed the resolution of both claims with the intention of forcing plaintiff to relinquish plaintiff's employment.

81. The failure to reinstate plaintiff to her position promptly or to make a decision regarding the grievance and disciplinary matters resulted in extreme emotional distress because plaintiff remained isolated and unable to pursue her employment.

82. The situation became further intolerable on February 27, 2006 when UCONN's attorney, Michael Eagan, informed plaintiff that termination of employment was an inevitable result of the disciplinary hearing process.

83. In addition, Dr. Ronald Taylor, Vice Provost of Multicultural and International Affairs, who was selected to adjudicate the disciplinary hearing, informed plaintiff that he believed the allegations of discrimination were unfounded and exaggerated. Dr. Taylor stated that he was aware of the July 15, 2005 e-mail communication from Deborah Rea, university student and DISP volunteer/intern, and believed plaintiff was overreacting. After hearing these statements, plaintiff began to have daily panic attacks, and experienced acute insomnia and depression.

84. In a letter plaintiff received on March 16, 2006, UCONN continued its retaliation by denying plaintiff the right to waive the pre-disciplinary hearing scheduled on March 20, 2006.

85. Plaintiff had communicated that she believed the statements made by Mr. Eagan and Dr. Taylor on February 27, 2006 were indicative of a tainted process and predetermined outcome.

86. On March 20, 2006, plaintiff was forced to meet with Dr. Taylor in a disciplinary hearing and respond to the same false allegations presented by Executive Director Boris Bravo-Ureta in the September 1, 2006 and October 18, 2005 fact-finding interviews.

87. By March 26, 2006, the circumstances of plaintiff's employment at the University of Connecticut became intolerable, and plaintiff resigned her employment.

88. After UCONN banned plaintiff from campus, and from interaction with university personnel and students on August 11, 2005, UCONN effectively exiled plaintiff from her personal network of friends that she could connect with for emotional and spiritual support.

89. Plaintiff became extremely depressed, gained excessive weight which increased complications to chronic health conditions she manages. After Atty. Eagen and Dr. Taylor affirmed that UCONN intended to continue violating plaintiff rights, she contemplated suicide.

90. In an effort to maintain her emotional health and well being, plaintiff worked two part-time jobs at minimum wage so that she could engage in some human interaction particularly since her immediate family lived in Virginia and they could not leave their jobs for over seven months.

91. Significantly, when plaintiff did encounter university personnel that she was acquainted with off-campus, plaintiff was forced to avoid contact and communication with them for fear that she would be accused of violating the barring order issued by Executive Director Bravo-Ureta.

92. After seven months of isolation imposed on plaintiff by UCONN, she felt lonely and isolated and believed that her future career opportunities were nonexistent at UCONN. Having predicted that she would be made the scapegoat for Director Wentzel's fraud and Executive Director Dr. Boris Bravo-Ureta's mismanagement, plaintiff was denied protection by Vice Provost Dr. Ronald Taylor when she informed him that her superiors had retaliated against her for expressing the truth about the affairs of the DISP.

93. Plaintiff reasonably believed that her actual employment relationship had for all intents and purposes been severed by UCONN and that UCONN was simply going through the motions of providing due process without any intention of adhering to basic principles of good faith and fair dealing.

94. Defendants Wentzel and Bravo-Ureta have subjected plaintiff to mean-spirited, adverse employment actions. Plaintiff had been provided with a negative performance evaluation, demoted, refused reasonable accommodations, treated unfairly because of her gender and race, placed on administrative leave based on false allegations, isolated and subjected to disciplinary hearings in retaliation for her speech asserting waste, fraud and mismanagement.

95. Defendants Wentzel and Bravo-Ureta also retaliated against plaintiff in response to her filing a complaint raising claims of unlawful discrimination in December 2005 with the Commission on Human Rights and Opportunity.

96. Defendants Wentzel and Bravo-Ureta acted with reckless indifference and engaged in willful and wanton conduct contrary to plaintiff's right to express herself on matters of public concern as protected by the First and Fourteenth Amendments to the United States Constitution enforce through 42 U.S.C. § 1983.

97. As a result of these unlawful acts, plaintiff has suffered a loss of merit increases at UCONN.

98. As a result of these unlawful acts, plaintiff was compelled to search for other employment under the threat of termination and subsequently forced to accept employment at another institution in a position of lesser rank and for $20,000 less per year in salary in a geographic region (Fairfax, Virginia) where the cost of living is

significantly higher than Storrs, Connecticut. Plaintiff's economic damages will continue into the future.

99. As a result of these unlawful acts, plaintiff has suffered emotional distress, humiliation, loss of self-esteem, loss of enjoyment of life and harm to her personal and professional reputation. Plaintiff's non-economic damages will continue into the future.

COUNT TWO:

1.- 99. Paragraph 1 through 99 of Count One are incorporated by reference and made paragraphs 1 through 99 of Count Two as though more fully set forth herein.

100. Defendant UCONN violated Connecticut General Statutes § 31-51q by disciplining and discharging plaintiff because she exercised her right to free speech protected by the constitutions of the United States of America and the State of Connecticut.

COUNT THREE:

1.-99. Paragraph 1 through 99 of Count One are incorporated by reference and made paragraphs 1 through 99 of Count Three as though more fully set forth herein.

100. Plaintiff has exhausted her administrative remedies by filing a timely complaint with the CHRO and the Equal Employment Opportunity Commission ("EEOC") on or about December 23, 2005 and by amending the complaint on or about March 31, 2006.

101. Plaintiff received a Release of Jurisdiction from the CHRO on September 13, 2006 and a Right to Sue letter from the EEOC on October 3, 2006.

102. Defendant UCONN has discriminated and retaliated against the plaintiff in the terms and conditions of her employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et. seq.

COUNT FOUR:

1.-101. Paragraph 1 through 101 of Count Three are incorporated by reference and made paragraphs 1 through 101 of Count Four as though more fully set forth herein.

102. Defendant UCONN has discriminated and retaliated against the plaintiff in the terms and conditions of her employment because of her race and gender and failed to accommodate her disability in violation of the Connecticut Fair Employment Practices Act, Connecticut General Statutes § 46a-60, et. seq..

COUNT FIVE:

1.-101. Paragraph 1 through 101 of Count Three are incorporated by reference and made paragraphs 1 through 101 of Count Five as though more fully set forth herein.

102. Defendant UCONN has discriminated and retaliated against the plaintiff in the terms and conditions of her employment because of her disability and failed to reasonably accommodate her disability in violation of the American with Disabilities Act, 42 U.S.C. § 12101, et. seq.

COUNT SIX:

1.-99. Paragraph 1 through 99 of Count One are incorporated by reference and made paragraphs 1 through 99 of Count Six as though more fully set forth herein.

100. Defendants Wentzel and Bravo-Ureta acted in concert to manufacture a false claim of insubordination in order to force plaintiff to resign her employment. When the false claim of insubordination could not be supported, defendants solicited complaints from co-workers and a university student and conducted a sham disciplinary hearing over a seven month period in an attempt to force plaintiff to resign her employment.

102. Defendants Wentzel and Bravo-Ureta have in engaged in conduct that a reasonable person would find to be extreme and outrageous.

103. Plaintiff has suffered severe emotional distress as a result of the defendants' intentional infliction of emotional distress.

WHEREFORE, plaintiff claims JURY TRIAL for all matters of fact triable to a jury, JUDGMENT against Defendants, jointly and severally, and DAMAGES as follows:

1. Legal and equitable relief pursuant to Connecticut General Statutes § 46a-104;

2. Compensatory damages for economic and non-economic losses;

3. Attorneys' fees and costs of this action pursuant to C.G.S. Section 46a-104, 42 U.S.C. 2000e5(k) and 42 U.S.C § 12117.

4. Punitive damages pursuant to 42 U.S.C. § 1981a and

5. Such other further relief, including reinstatement and front pay, as this Court deems necessary and proper.

PLAINTIFF,
HERBERTIA WILLIAMS

100.    Defendants Wentzel and Bravo-Ureta acted in concert to manufacture a false claim of insubordination in order to force plaintiff to resign her employment. When the false claim of insubordination could not be supported, defendants solicited complaints from co-workers and a university student and conducted a sham disciplinary hearing over a seven month period in an attempt to force plaintiff to resign her employment.

102.    Defendants Wentzel and Bravo-Ureta have in engaged in conduct that a reasonable person would find to be extreme and outrageous.

103.    Plaintiff has suffered severe emotional distress as a result of the defendants' intentional infliction of emotional distress.

WHEREFORE, plaintiff claims JURY TRIAL for all matters of fact triable to a jury, JUDGMENT against Defendants, jointly and severally, and DAMAGES as follows:

1.    Legal and equitable relief pursuant to Connecticut General Statutes § 46a-104;

2.    Compensatory damages for economic and non-economic losses;

3.    Attorneys' fees and costs of this action pursuant to C.G.S. Section 46a-104, 42 U.S.C. 2000e5(k) and 42 U.S.C § 12117.

4.    Punitive damages pursuant to 42 U.S.C. § 1981a and

5. Such other further relief, including reinstatement and front pay, as this Court deems necessary and proper.

> PLAINTIFF
> HERBERTIA WILLIAMS
>
> By: _____
> Jacques J. Parenteau, of
> Madsen, Prestley & Parenteau, LLC
> 111 Huntington Street
> P.O. Box 1631
> New London, Connecticut 06320
> (860) 442-2466
> Attorneys for the Plaintiff



ATTEST: A TRUE COPY
BRIAN FRANCIS ZITO
CONNECTICUT
STATE MARSHAL

RETURN DATE: DECEMBER 19, 2006

| | | |
|---|---|---|
| HERBERTIA WILLIAMS,<br>            PLAINTIFF | : <br> : <br> : | SUPERIOR COURT |
| VS. | : <br> : | JUDICIAL DISTRICT<br>OF HARTFORD |
| BOARD OF TRUSTEES FOR THE<br>UNIVERSITY OF CONNECTICUT,<br>BORIS BRAVO-URETA,<br>MARK WENTZEL | : <br> : | |
|             DEFENDANTS | : | NOVEMBER 14, 2006 |

## STATEMENT OF AMOUNT IN DEMAND

The amount in demand is greater than $15,000.00, exclusive of interest and costs of suit.

PLAINTIFF,<br>
HERBERTIA WILLIAMS<br>
By: _____<br>
Jacques J. Parenteau, of<br>
Madsen, Prestley & Parenteau, LLC<br>
111 Huntington Street<br>
P.O. Box 1631<br>
New London, Connecticut 06320<br>
(860) 442-2466<br>
Attorneys for the Plaintiff

ATTEST: A TRUE COPY
BRIAN FRANCIS ZITO
CONNECTICUT
STATE MARSHAL

28